## RIGHTS UNDER A RESCINDED CONVEYANCE MADE IN FRAUD OF CREDITORS.

[Circuit Court of Jefferson County].

PARKINSON v. PARKINSON.

Decided, November, 1902.

*Conveyance—In Fraud of Creditor—Settlement Made With Creditor—Conveyance Rescindea by Consent of Grantee—Grantor Remains in Possession—Suit in Ejectment by Heirs of Grantee.*

A deed of conveyance was executed and delivered for the purpose of defrauding a creditor. Subsequently the grantor compromised and settled the claim of the creditor, and thereafter it was agreed between the grantor and grantee that the conveyance should be canceled and the notes representing the purchase price and the deed surrendered and destroyed. The notes were produced and destroyed, but the deed could not be found, because fraudulently abstracted by a son of the grantee. The grantor remained in possession, and he and the grantee lived for some years thereafter in the belief that the deed had been lost and destroyed, and both died in that belief. *Held:* That in an action in ejectment, brought against the heirs of the grantor by the heirs of the grantee, including the son who had concealed the deed, that the petition should be dismissed and the title to the land quieted in the heirs of the grantor.

Cook, J.; Laubie, J., and Burrows, J., concur.

John Parkinson and Joseph Parkinson were brothers; there was less than two years difference in their ages; John was a bachelor up to 1885, when he married, being then nearly fifty; he died in 1898 leaving a widow and a son fifteen years of age. Joseph was married early in life, and died in 1900, leaving a widow and six children, sons and daughters. They were both over seventy years of age when they died.

From their earliest manhood they lived on adjoining farms, which were valuable, and contained nearly three hundred acres each. In 1881 John was sued by a woman by the name of McKinney, a widow, for breach of contract of marriage, claiming $1,500 damages. The suit was compromised and settled just a year afterwards by his paying her $700. The suit was settled with the knowledge and approval of Joseph. Five days after the commencement of the action of Mrs. McKinney, John made to

Joseph a deed for his farm and delivered the same to him; the consideration named in the deed was $16,000, about the actual value of the farm, and Joseph made and delivered to John a promissory note or notes for the consideration named in the deed. The deed was never placed on record by Joseph or any one for him. Junius Parkinson, a young lawyer, son of Joseph, and nephew of John, was the attorney who attended to the business; he lived with his father, and he died a short time after the settlement of the action for breach of promise. The evidence shows that the deed was made for the purpose of hindering, delaying and defeating Mrs. McKinney in the collection of her claim or pretended claim, and that both John and Joseph so understood it at the time the deed was executed.

Soon after the action of Mrs. McKinney against John was settled, John and Joseph verbally agreed that they would cancel the sale of the farm, by Joseph delivering back to John the deed and John surrendering the note or notes for the $16,000 to Joseph, the deed and note or notes to be destroyed; and thereupon, in pursuance of said agreement, John did surrender the note or notes to Joseph and he destroyed the same. Joseph, for the purpose of carrying out his part of the agreement, looked diligently among his papers for the deed, but could not find it, and informed John he could not find it, and that it must have been in some manner destroyed. Some time after this statement to John by Joseph, possibly a year, John again called Joseph's attention to the fact that he wanted the deed or that he must be assured of its destruction and seemed exercised about it. Joseph again looked for the deed and again told John that he could not find it, that Junius must have destroyed it before his death, as he had told him to do so, or that he had inadvertently destroyed it with some old papers that he had burned, and that John should not be troubled about it, as he knew it was destroyed. Joseph spoke to other parties about the deed, stating that he had a valuable paper that belonged to John and he could not find it; that John should have it and that he would give a good deal if he could find it and deliver it over to John. The fact was that John J. Parkinson, son of Joseph and one of the plaintiffs, some time after the deed was executed and before his father had searched for it, had abstracted the same

from the papers of his father or from the trunk of his brother, Junius, without the father's knowledge, and that that was the reason the same could not be found.

John and Joseph both lived and died under the full belief that the deed had been destroyed in accordance with the agreement, and that such destruction was sufficient to reinvest John with the complete title to the farm. As we have seen, John married and a son was born to him after the agreement to cancel the sale, and John continued to reside upon the farm after the execution of the deed, the same as before and up to his death, paid the taxes, made ordinary improvements, Joseph never making any claim to the farm, or for any rent for the use of the same. After the death of Joseph, John J., his son, who had secretly abstracted the deed, placed the same on record, and he, with the other children of Joseph, brought this action in ejectment against the widow of John Ascenith Parkinson, and the son, John S. Parkinson. The defendants filed an answer and cross-petition, denying that the plaintiffs had any interest in the farm, and setting forth that the conveyance was without consideration, and that the plaintiffs held the legal title to the farm in trust for the defendants, and asking that the deed be canceled and their title to the farm be quieted. To this answer and cross-petition plaintiffs replied that the deed was executed for the purpose of hindering, delaying and defeating Mrs McKinney in the collection of her claim for damages for breach of contract of marriage.

Under the pleadings and the facts as stated, what are the rights of the parties? No principle is better settled in this state than that where two or more persons are engaged in a fraudulent transaction to injure another, neither law nor equity will interfere to relieve either of those persons as against the other from the consequences of their own misconduct. The courts will leave them in precisely the condition in which they placed themselves by their fraudulent act. Therefore, under the averment of the reply of the plaintiffs and the facts of the case, the petition of plaintiffs must necessarily be dismissed.

The defendants, the heirs of John Parkinson, claim further that under the facts of the case they are entitled to affirmative relief and have the right to have the deed canceled and their title to the

premises quieted.  It is the settled principle of the law of the state that, while a conveyance made to defraud creditors is utterly void as to them, yet is good as between the parties, and that the courts will not relieve them from the consequences of their own fraudulent act, and that a conveyance for the purpose of defeating a party from the collection of a claim in litigation, in case the judgment is adverse to him, is such fraudulent conveyance (*Pride* v. *Andrew*, 51 Ohio St., 405).  Do the facts of this case bring it within the rule?

In a very early case (*Swift* v. *Holdridge*, 10 Ohio, 230, 231, 232), it is said by Lane, C. J.:

"An honest man will not take a fraudulent conveyance.  If a man holds property fraudulently conveyed, as soon as he comes to a sense of his moral duty he will restore it to those to whom it belongs; he ought to give it back to him from whom he received it, that it may be applied to his debt if wanted, or to his benefit if not necessary for this purpose.  The law to discourage frauds does not compel him to restore it to the fraudulent grantor; yet no man will retain it for a moment who desires the reputation of honesty, or possesses the sense of justice."

In the case of *White* v. *Brocaw*, 14 Ohio St., 339, 341, Ranney, J., says:

"In respect to the ground of relief stated in the bill, to which reference has been made, it is enough to say, that no principle is better settled than that a conveyance made to defraud creditors is good between the parties and no remedy is afforded the fraudulent grantor or his heirs to reclaim the property.  But this rule has its foundation in the anxiety of the law to discourage frauds, and the moral obligation of the grantee to restore the property so held, is not only clear but is fully recognized in the decided cases (*Swift* v. *Holdridge, supra*).  If he does restore, the law discharges him from liability as a trustee for the creditors of his grantor, and undoubtedly any steps taken or acts done by him subsequent to the conveyance toward the discharge of his moral duty should receive the favorable consideration of a court of equity."

In *Pride* v. *Andrew*, 51 Ohio St., 405, 414, Dickman, C. J., says:

"While such a conveyance with intent to defraud creditors is, as against creditors, thus made absolutely void, the principle is

well settled that such a conveyance is good between the parties, and no remedy is afforded the fraudulent grantor or his heirs to reclaim the property.    While the fraudulent grantee, from a sense of his moral duty, ought to give back the property to him from whom he received it, yet the law, to discourage frauds, will not compel him to restore it to the fraudulent grantor."

See also *Langsdale* v. *Woollen,* 99 Ind., 575, 582; *Parker* v. *Tiffany,* 52 Ill., 286; *Matthews* v. *Buck,* 43 Me., 265; *Fargo* v. *Ladd,* 6 Wis., 106.

If Joseph Parkinson had retransferred the property to his brother by a deed, however defective, there could be no doubt but what a court of equity would uphold it.    How, then, can it be claimed that what the brothers did, as shown by the facts of this case, should not be equally as effective.    The action against John was compromised and settled with the knowledge of Joseph, and no doubt with his active approval.    Soon afterwards the agreement was made to rescind the contract by which the property was conveyed and the note or notes were delivered up and destroyed which were given as the consideration for the farm and which would have been valid in the hands of an innocent purchaser for value.    Joseph did his utmost to deliver back the deed to his brother, as he had agreed to do, and was only thwarted in his just intention by the almost criminal fraud of one of the plaintiffs to this action.    Both died in the full belief that the deed was destroyed and that that was equivalent to a redelivery of it to John to be destroyed.    It is a rule of equity that "that is done which ought to have been done," and it is certainly emphasized when the facts show not only what ought to have been done but what in good faith was supposed to have been done; therefore, in legal contemplation, the deed was redelivered by Joseph to John and by him destroyed.    There could be no taking possession of the farm by John, as Joseph was never in possession and had no possession, legal or otherwise, to deliver.

The object and purpose of the cross-petition is not to require the heirs of Joseph to reconvey the farm, but it is to make effective the agreement made between the two brothers and to estop the plaintiffs from claiming under a deed of conveyance to which they are not entitled; to place the plaintiffs in such position as they

would have been if the deed had been actually returned by their father to his brother and by him destroyed, or had been destroyed by Joseph at his brother's request, for the purpose of reinvesting the title to the farm in his brother, as he fully thought he had done and which, as said in *White* v. *Brocaw, supra,* was his moral obligation to do. In Washburn on Real Property, Section 1907, under the heading of "Destruction and Redelivery of Deeds," the author says:

"It sometimes happens that parties to an executed conveyance wish to place themselves *in statu quo,* and to effect this the deed is returned to the grantor and destroyed. Although the redelivery of the deed was ineffectual to pass the title back, the transaction contains all the elements of an estoppel, and the grantee will not be allowed to claim under the deed which was destroyed with his consent with the intent to deprive him of his estate."

The doctrine is more fully discussed by the same author in Section 2182 of his work. In *Dukes* v. *Spangler,* 35 Ohio St., 119, the principle enunciated by Mr. Washburn is recognized as applicable in certain cases, and on page 126, Okey, J., says:

"The general rule undoubtedly is that when the instrument conveying an estate has taken effect, its destruction by the parties will be ineffectual, even if they intended thereby to revest the estate in the grantor. * * * But it has been held, in a large number of cases, that a grantee who has thus voluntarily consented to the destruction of his deed, shall not have affirmative relief under it. * * * The ground of these decisions, at least the only tenable ground, is not that the estate revests, but that the grantee is estopped (*Farrar* v. *Farrar,* 4 N. H., 191; *Trull* v. *Skinner,* 17 Pick., 213). Under some circumstances, no doubt, we would feel called upon to give effect to such estoppel."

In this case the plaintiffs are asking for affirmative relief, they are seeking to obtain possession of the premises under the deed which their ancestor had surrendered to be destroyed, or done that which was equivalent to its surrender and destruction for the purpose of canceling it and reinvesting the title to the property in its rightful owner. This is certainly one of the cases where the circumstances demand that the general rule requiring an actual reconveyance by deed should not apply, and that the doctrine of

estoppel should be given effect. In the case of *Langsdale* v. *Woollen*, 99 Ind., 575, pages 582 and 583, it is held:

"An agreement between grantor and grantee after deed made as to the disposition of the land purges the original fraud and is valid though not in writing."

From principle and authority, under the circumstances of this case, we think the plaintiffs are estopped from claiming any interest in the premises under the deed of John Parkinson to Joseph, his brother. No creditors are complaining; there are none to complain. It would be shocking to the conscience of the court to be required to hold that the laudable acts of these two brothers, by which, in good faith, they supposed they had fully reinvested the title to the land in John, are of no avail.

It is therefore ordered and decreed that the petition of the plaintiffs be dismissed; that the deed from John Parkinson to Joseph Parkinson be canceled; that the title of defendants in the premises be quieted, and that plaintiffs pay the costs of this action.